**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

PAMELA S. PORTER, )
)
        Plaintiff, )
)
v. )    No. 4:17-cv-00072-NKL
)
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
)
        Defendant. )

## ORDER

Plaintiff Pamela Porter appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits under Title II and Title XVI of the Social Security Act. For the following reasons, the Court reverses and remands the decision of the ALJ.

## I.    Background

Porter was born in 1970, and alleges that she became disabled beginning on 2/3/2012. She filed her initial applications for Titles II and XVI benefits on 6/14/2012. The ALJ held a hearing on 11/13/2013, and issued a decision denying benefits on 1/31/2014. After the Appeals Council declined to review the ALJ's decision, Porter appealed to this Court. On 6/22/2015, the Court found that the ALJ committed reversible error, and remanded the case for reconsideration. *See Porter v. Colvin*, No. 4:14-CV-00813-NKL, 2015 WL 3843268, at *1 (W.D. Mo. June 22, 2015); Tr. 744. On 11/9/2016, the ALJ held a second hearing, and on 11/30/2016 issued another unfavorable decision. Porter then filed a timely appeal with this Court.

### A.    Medical history

Porter claims disability based primarily on morbid obesity, Chronic Obstructive

Pulmonary Disease (COPD), bilateral knee degenerative arthritis, sleep apnea, depression, anxiety, carpal tunnel, a right shoulder impairment, hypertension, and GERD.

In August 2009, Porter presented to the ED with a cough, intermittent fevers, and a sore throat. She was diagnosed with bronchitis with wheezing, and prescribed Bactrim, Prednisone, and Tessalon Perles. Tr. 347. A week later Porter was admitted to the hospital, and treated with Cymbalta and a CPAP machine. She spent three days in the hospital, and was discharged with prescriptions for Xanax, Cymbalta, Lisinopril/HCTZ, Prednisone taper, Advair, and Singulair. Her diagnoses included asthma exacerbation, tobacco abuse, obesity, hypertension, and depression. Tr. 339.

In June 2010, Porter visited Dr. Navato, her treating psychiatrist. Her mood was depressed, and Dr. Navato prescribed Trazodone for her anxiety. Tr. 384. Porter returned to Dr. Navato in December 2010, and by January 2011 she reported feeling hopeful and her mood was stable. Tr. 382. In May 2011, however, Porter reported that she was not sleeping well and felt the effects of her medication were not lasting as long. She stated that her whole body was hurting, and the pain was waking her up. Tr. 381. In June 2011, Porter reported that she was still in pain "all the time." Tr. 380.

In October 2011, Porter was evaluated in the emergency department. She stated that she had suffered back and leg pain for the last five days, and that she had fallen out of bed the previous night. Sciatica was diagnosed, and Ultram, Prednisone, and Soma were prescribed. Tr. 413. Porter returned to the emergency department in December with vomiting and diarrhea.

In January 2012, Porter visited Dr. Navato again. Her mood was euthymic, and she was still battling depression. She reported sleep disturbance, low motivation, and low mood. She was diagnosed with major depressive disorder and anxiety disorder, and Abilify was prescribed. Tr. 378. Several weeks later Porter reported that she was still depressed and could not tolerate

Abilify. Trazodone and Abilify were discontinued, and Cymbalta, Seroquel, Xanax, and Lidoderm patches were prescribed. Tr. 377.

In February 2012, Porter returned to the emergency department because she injured her right shoulder at work trying to lift fifty pound bags of cat litter. She was diagnosed with a right shoulder strain, and Zanaflex and Vicodin were prescribed. Tr. 417.

Throughout March 2012, Porter visited various physicians complaining of shortness of breath, intermittent fever, and chills. She refused BiPAP and intermittently took off her oxygen. During one visit she was found to have pneumonia and admitted to the hospital. Tr. 423. While in the hospital, one of Porter's doctors learned that she may not have been getting the amount of oxygen that she needed. Tr. 431. The doctor diagnosed exacerbation of COPD, pulmonary infiltrates, hilar and mediastinal adenopathy, oropharyngeal thrush, obesity, and obstructive sleep apnea. Tr. 432. When Porter was ultimately discharged from the hospital, her medications included Levaquin, Diflucan, Prednisone, Albuterol nebulizer solution, Vitamin D, Guaifinesin, Prilosec, Colace, Milk of Magnesia, Dyazide, Lisinopril, Pravastatin, Xanax, Cymbalta, Tramadol, Tylenol, Skelaxin, Advair, Zanaflex, Iron, low-dose Insulin sliding scale, and Zyrtec. Tr. 424.

In April 2012, Porter visited Erich Lingenfelter, M.D., who evaluated her for pain in her right shoulder. Tr. 1546. She reported that physical therapy had not been helpful. X-rays were negative, and an MRI did not show any structural damage to the rotator cuff but showed some degenerative changes. Dr. Lingenfelter stated that Porter's pain was drastically out of proportion to any pathology that this mechanism might cause, and noted that Porter was grossly obese, with extremely poor body habitus, and fibromyalgia. He also observed that Porter was on Cymbalta and anxiolytic medications, which can cause perceptions of pain to be over the top at times. Tr. 1546. He released Porter to work with limitations in overhead lifting and repetitive outreaching.

Tr. 1547.

Porter visited Dr. Navato again in May 2012. Her mood was dysthymic with a normal affect. She experienced problems with depression and insomnia, was not working, and had no income. She was prescribed Trazodone, Cymbalta, Seroquel, Xanax, and Lidoderm patches. Tr. 375. Porter also saw Dr. Lingenfelter again, who released her to full duties with respect to her right shoulder. Tr. 2310.

In July 2012, Porter visited Rachel Whitfield, a nurse practitioner. Tr. 363. She reported feeling "okay," but had upper respiratory infection symptoms, and an examination showed scattered wheezing. Porter was diagnosed with tobacco use disorder, HTN, lumbago, chronic airway obstruction, obesity, and esophageal reflux. She also had very elevated cholesterol, and Fish Oil was prescribed. Cipro was prescribed for chronic airway obstruction, and samples of Symbicort aerosol and Albuterol nebulizer were given. Tr. 395.

Porter's mental state was unchanged through August 2012. She visited Dr. Navato in September 2012, and reported that she enjoyed her summer and spent time reading. However, by October she reported that she was not journaling because she was afraid someone would find the journal and use the information against her. Tr. 525.

Dr. Navato examined Porter in January 2013, which revealed a smoker's cough, normal gait, mildly depressed mood, good attention and concentration, normal memory, and good judgment. Tr. 522. In February Porter visited R. Whitfield, NP, and was diagnosed with COPD exacerbation, morbid obesity, and sleep apnea. Cipro and Prednisone were prescribed, and Porter was referred to a bariatric surgeon and to sleep medicine. Tr. 612-13. In March, Porter was examined by Dr. Bhat in the Sleep Clinic. A sleep study showed "very severe obstructive sleep apnea," which was corrected during the study. The following day, Porter reported "the best sleep quality" and extra energy. Tr. 545.

4

In April 2013, Porter presented to the emergency department with bilateral foot pain and swelling. An EKG showed sinus tachycardia. A chest x-ray showed mild multilevel degenerative disc disease within the spine and mild cardiomegaly. Tr. 557. HCTZ and Ultram were prescribed. Tr. 560. An echocardiogram later that month revealed normal left ventricular ejection fraction, tachycardia, and trace mitral regurgitation. She was admitted to the hospital a week later for pitting edema in both legs, fatty infiltrate of the liver, and acute exacerbation of COPD and dyspnea. Tr. 587-88.

In May 2013, Porter saw Dr. Bhat and reported 62% compliance with her CPAP. She was encouraged to increase her compliance, lose weight, and stop smoking. Porter was also examined by R. Whitfield, NP, and reported experiencing right knee pain, which intensified with bending and weight bearing. She rated her pain an 8 out of 10. She was diagnosed with osteoarthritis, allergic rhinitis, hypercholesterolemia, tobacco use disorder, chronic airway obstruction, and esophageal reflux. Meloxicam and Zyrtec were prescribed. Tr. 607.

In June 2013, Porter presented to the emergency department, where a chest x-ray revealed chronic interstitial changes and peribronchial cuffing consistent with chronic bronchitis. Prednisone and breathing treatments were administered, and Porter reported feeling better. Tr. 554. Dyspnea, COPD exacerbation, and bronchitis were diagnosed, and Prednisone and Levaquin were prescribed. Porter was also directed to use home oxygen and breathing treatments. Tr. 554. Porter continued to visit the emergency department and her doctors throughout July and August complaining of similar symptoms and receiving similar diagnoses.

In August 2013, Porter was examined by Dr. Conaway, a cardiologist, for pre-op clearance prior to possible lap band surgery. Tr. 621. Dr. Conaway opined the edema was likely due to venous stasis secondary to morbid obesity. He opted to re-evaluate Porter again in three months.

In October 2013, Porter was examined for a cough and upper respiratory infection that was not responding to her medications. Tr. 984. Examination showed pharyngeal edema and moderate wheezes, and upper respiratory infection and acute sinusitis were diagnosed. Tr. 986. Cipro and Guafenesin were prescribed. Tr. 987. Later that month, Porter was examined for a bad cold with productive cough. She was running low on breathing treatment medication and had no energy. She reported using her CPAP faithfully. She was diagnosed with allergic rhinitis, obstructive sleep apnea, morbid obesity, COPD, and acute bronchitis. She was prescribed Albuterol nebulizer solution, Symbicort, Albuterol inhaler, Prednisone taper, and Singulair to help midgate her symptoms.

Porter visited Dr. Navato in February 2014, where she had an elevated/expansive, irritable mood, decreased sleep, flight of ideas/racing thoughts, and increased activity/psychomotor retardation. She was diagnosed with major depressive disorder for which Zoloft was to be increase, and she received refills on Trazadone, Xanax, Abilify, and Lyrica. Tr. 1292. In April 2014, R. Whitfield, NP, reported that Porter was feeling down, depressed, or hopeless, and suicidal ideation more than half the days. Tr. 1103-04.

In July 2014, Porter visited Pim Jetanalin, M.D., in the rheumatology clinic. She reported low back, hip, and knee pain, as well as weakness, decreased activity, nasal congestion, shortness of air, nausea, and depression. Tr. 1166. She was diagnosed with chronic multiple joint and back pain, COPD, morbid obesity, and obstructive sleep apnea. Tr. 1167-68.

In August 2014, Porter reported to the emergency room for lower back pain, and examination showed tenderness in the lumbar spine. Tr. 977. Two weeks later, Porter visited the rheumatology clinic again, for pain in lower lumbar, hips, and knees. She also reported fatigue, nausea, and depression. Tr. 1051-1053. A chest x-ray showed chronic interstitial changes and peribronchial cuffing consistent with chronic bronchitis. Physical therapy and

strengthening exercises were recommended. Dr. Jetanalin preferred to avoid narcotic pain medication due to the potential for addictions, tolerance, and overdose. Neurontin was added to Meloxicam and Cymbalta.

Throughout October 2014, Porter visited neurosurgery and the rheumatology clinic for back, hip, and knee pain. Tr. 1649-54, 1037. She received diagnoses of low back pain, lumbar spine spondylosis, mid thoracic pain, morbid obesity, Tr. 1650, osteoarthritis and degenerative disc disease, and spinal stenosis. Tr. 1042. Physical therapy was recommended, but Porter stated that she could not afford it. Celebrex, Flexeril, and Ultracet were prescribed, Gabapentin was continued, and weight loss and smoking cessation were encouraged.

Porter was admitted to the hospital in December 2014. Her discharge diagnoses included COPD exacerbation, acute bronchitis, acute sinusitis, respiratory distress, morbid obesity, type 2 diabetes, obstructive sleep apnea, hypertension, depression, leukocytosis, dyslipidemia, hypercapnia, and tobacco abuse. Tr. 1203. Discharge medications included azithromycin, Proventil, DuoNeb treatments, Norco, Advair, Mucinex, Vantin, Cymbalta, Xanax, Simvastatin, Tylenol, Flexeril, Prinzide, Potassium, Lasix, Mobic, Zetia, Neurontin, and Oxygen. Tr. 1204.

In January 2015, Porter returned to neurosurgery. She continued to take Ultracet, and still had lower back pain. Low back pain, lumbar spondylosis, morbid obesity, and hypertension were diagnosed. Surgery was not recommended. Porter also visited Dr. Navato, who conducted a psychiatric evaluation. He diagnosed major depressive disorder requiring ongoing therapy and psychotropics, including Zoloft, Trazadone, Xanax, Abilify, Lyrica, and Lunesta.

In February 2015, a pulmonary function test showed mild obstructive airway disease of the peripheral airway. Tr. 1300. Porter also visited the emergency department with right knee pain, was prescribed Norco, and referred to sports medicine. Tr. 1982. She returned to neurosurgery, where she was seen for continued low back pain. Lyrica and Flexeril provided

little relief, and Porter was unable to afford physical therapy. She also reported decreased activity, depression, and anxiety. Tr. 1831. Home exercise, pain management, Zanaflex, and Tramadol were prescribed, and Ultracet and Flexeril were discontinued.

Porter visited Dr. Schulz in sports medicine in March 2015. Diagnoses included right rhomboid strain due to poor posture and severe medical compartment osteoarthritis of the right knee. Injections with a heel wedge were recommended, as was a knee replacement. Tr. 1955. A trigger point injection was administered for Porter's right shoulder, as well as exercises. Two weeks later, Porter reported that the shoulder injection provided one week of improvement. Tr. 1957.

In April 2015, Porter was seen in orthopedics for her right knee pain. Tr. 1978. Dr. McCormack performed a right knee arthroscopy and partial meniscectomy. Tr. 1996-97. Two weeks later, Porters symptoms had improved, but Dr. McCormack still indicated that a partial knee replacement would eventually be necessary. Porter returned to the orthopedic clinic in July, because her right knee pain was not responding to anti-inflammatories. An injection was given, and an assistive devise recommended.

In August 2015, Dr. McCormack performed a right knee replacement for Porter. Tr. 1993. In September 2015, five weeks post-op, Porter ambulated with a cane, and reported she was "pleased with her progress." Tr. 1964. In November 2015, Porter was discharged from physical therapy. Tr. 1928.

Plaintiff was hospitalized for a week in April 2016, with acute-on-chronic respiratory failure, post-viral pneumonia, hypercholesterolemia, GERD, hypertension, and steroid induced hyperglycemia. Tr. 2132.

In June 2016, Porter visited the sleep clinic, and was noted to be using her CPAP 93% of the time. Diagnoses included severe obstructive sleep apnea—intolerant of CPAP and nocturnal

hypoxemia.  Tr. 1796.

**B.      Expert Opinions**

Michael Navato, M.D., Porter's treating psychiatrist, completed several reports regarding Porter's functional capacity.  Dr. Navato's 2013 report revealed greater restrictions than a 2012 report.   In August 2013, Dr. Navato completed a Mental Residual Functional Capacity Assessment form, in which he opined that Porter suffered from mild limitations in her ability to remember locations and work procedures; understand, remember, and carry out very short and simple instructions, sustain an ordinary routine without special supervision, interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and be aware of normal hazards and take appropriate precautions.  Tr. 569.  He opined that Porter was moderately limited in her ability to travel in unfamiliar places or use public transportation.  Tr. 570.  Dr. Navato stated that Porter had marked limitation in her ability to maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, make simple work-like decisions, get along with co-workers and peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others.  Tr. 569-70.  Dr. Navato stated that Porter was extremely limited in her ability to complete a normal workday or work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number or length of rest periods, and get along with coworkers and peers without distracting them or exhibiting behavioral extremes.

In October 2016, Dr. Navato updated his opinions and confirmed that Porter had been treated with outpatient individual psychotherapy, group therapy, and medication trials but that her problem areas prevented her from returning to full time work.  He also completed another

Mental Residual Functional Capacity Assessment. Tr. 2199. Dr. Navato opined that Porter had marked limitations in the ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers and peers without distracting them or exhibiting behavioral extremes. Tr. 2200. Dr. Navato also opined that Porter had marked limitations in the ability to work in coordination with or proximity to others without being distracted by them. He also opined that Porter had moderate limitations in her ability to respond appropriately to change in the work setting, and set realistic goals or make plans independently of others. Tr. 2200. The ALJ considered Dr. Navato's statements that Porter is markedly limited secondary to emotional/mental impairment, but afforded them little weight. The ALJ considered Dr. Navato's statements with regard to Porter's ability to return to competitive employment, but afforded them no weight. Tr. 646-47.

Charles W. Watson, Psy. D., a State Agency reviewing physician, offered an opinion in September 2012. Tr. 122. Dr. Watson stated that Porter had mild restrictions of activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace due to medically determinable affective and anxiety disorders. Tr. 121. He opined that Porter appeared to have the ability to acquire and retain at least simple instructions and to sustain concentration and persistence with simple repetitive tasks and had no significant impairment with social interaction. Dr. Watson opined that Porter was moderately limited in her ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, work in coordination

10

with or proximity to others without being distracted by them, and interact appropriately with the general public. Tr. 126. The ALJ gave Dr. Watson's opinions some weight. Tr. 647.

Mel Moore, M.D., a State Agency reviewing physician, provided a statement in October 2012. Dr. Moore opined that Porter could lift and/or carry 20 pounds occasionally, 10 pounds frequently, stand or walk for six hours per day, and sit for six hours per day. Tr. 124. He opined that she was able to climb ramps and stairs frequently; climb ladders, ropes, and scaffolds occasionally; and frequently balance, stoop, kneel, crouch, and crawl. Tr. 124. He opined that she should avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. Tr. 125. The ALJ gave Dr. Moore's opinions some weight.

P. Brent Koprivica, M.D., a consultative examiner, provided a statement in April 2013. He indicated that Porter should avoid repetitive reaching tasks with the right upper extremity; that she should avoid repetitive pushing or pulling tasks with the right upper extremity; that she should avoid repetitive or sustained activities above the shoulder girdle level on the right; and that she would be limited from overhead lifting using the right arm at the shoulder. Tr. 1576. In June 2016, Dr. Koprivica reviewed additional medical records and amended his opinion. Although he stated that his opinions would not materially change, he indicated that Porter is permanently disabled. Tr. 2171. The ALJ gave Dr. Koprivica's April 2013 statement limited weight, but his June 2016 amendment no weight. Tr. 646.

A licensed psychologist, John Keough, MA, examined Porter in December 2015. Tr. 1315. The examination showed mild-to-moderate depression and hostility. Mr. Keough opined that Porter's ability to understand and remember instructions was unimpaired. That she had the ability to sustain concentration, persistence, or pace necessary for full-time employment with simple tasks. Tr. 1317. He also opined that Porter had mild-to-moderate impairments of getting along with others due to depression and anxiety. Tr. 1317. Mr. Keough completed a checkbox

medical source statement, which indicated no limitations in the ability to understand, remember, and carry out instructions, mild limitations interacting with the public or co-workers, and moderate limitations in interacting with supervisors and responding to changes in a routine work setting. Tr. 1321-22. The ALJ gave Mr. Keough's opinion's some weight. Tr. 647.

Martin Isenberg, Ph.D., a state agency psychological consultant, reviewed Porter's records in February 2015. He opined that she had mild restriction of activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace. Tr. 717. Dr. Isenberg opined that Porter was moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors. Tr. 722. The ALJ did not identify the weight given to Dr. Isenberg's opinions.

Nancy Ceaser, MD, a non-examining, non-treating state agency physician, completed a Residual Functional Capacity form on February 10, 2015. Tr. 718-720. She opined that Porter could lift and/or carry 10 pounds; stand and/or walk 2 hours; sit 6 hours; never climb ladders, ropes, scaffolds; occasionally climb ramps, stairs, balance, stoop, kneel, crouch, crawl; should avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, vibration; and avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation; hazards such as machinery and heights. Tr. 718-20. The ALJ did not identify the weight given to Dr. Ceaser's opinions.

Kala Danushkodi, MD examined Porter in December 2015. Tr. 1326. She opined that Porter could occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry up to 10 pounds; sit 4 hours at a time for up to 8 hours; stand and/or walk 2 hours at a time for up to 4 hours; requires a cane to ambulate on uneven surfaces; frequently reach, handle, finger, feel, push and/or pull with the hands; occasionally operate foot controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; never balance, stoop, kneel, crouch, or crawl;

never be exposed to unprotected heights, extreme cold, extreme heat; occasionally be exposed to moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes, pulmonary irritants, and vibration. Tr. 1328-32. The ALJ gave Dr. Danushkodi's opinion some weight. Tr. 645.

On December 23, 2015, vocational expert Dr. Michael Dreiling conducted a vocational assessment. Dr. Dreiling interviewed Porter, reviewed her vocational history, and reviewed her medical records. Tr. 2580. He opined that she was unable to compete in the open job market, and that she would not be capable of performing substantial gainful employment at any type of job in the labor market. Tr. 2591. The ALJ afforded Dr. Dreiling's opinion no weight.

**C. The Hearing before the ALJ**

On 11/9/2016, Porter testified at her hearing that she was 46 years old, has a GED, and has not worked since her alleged onset date of 2/3/2012. Tr. 666. She stated that she had a cosmetology license in the past, and that cosmetology work was her only previous full time job. Tr. 667.

Porter testified that in the time since her first hearing she had knee replacement surgery in one leg, and was scheduled for a second knee replacement. Tr. 668. She testified that her knees cause significant pain, and limit her ability to stand and to walk. She also testified about lower back pain, which affects her ability to sit. Tr. 669. Porter testified that her right shoulder is also constantly in pain. Tr. 670. She testified that she has pain in her feet and ankles caused by osteoarthritis. Tr. 670. She stated that fibromyalgia caused "flu-like" symptoms three or four times a week. Tr. 671. Porter also testified that "feeling of worthlessness," crying, and extreme lows prevent her from working, that she is bipolar, has manic episodes, and anxiety. Tr. 672. She stated that she is on a lot of medication to manage her depression, but that it helps considerably. Tr. 672. Porter also testified to her pulmonary and breathing problems.

Porter stated that she could not go up or down stairs, that she always takes someone shopping with her, and that she cannot carry her bags when she shops. She stated that she does the dishes, though she must do them in increments, and that she does not do the laundry because it is located in the basement, however she helps fold clothes. Porter stated that she smokes two packs of cigarettes a day.

Dr. Veltrano testified as a vocational expert at the hearing. Tr. 677. The ALJ posed to Dr. Veltrano a hypothetical question, involving an individual of Porter's age, education, and past work experience. Tr. 678. The hypothetical individual could perform sedentary work, lift ten pounds occasionally; stand and walk for about two hours and sit up to six hours in an eight hour work day. The individual is capable of frequent pushing and pulling with the upper extremities, and occasional foot control operations. The individual could not climb, kneel, crouch, or crawl, walk on uneven surfaces, or reach overhead. The individual could occasionally stoop, and is capable of frequent handling and fingering, and reaching in all directions except overhead. The individual could not be exposed to extreme heat or cold, or any pulmonary irritants such as fumes, odors, dust, gases, or poorly ventilated areas. The individual could not work around unprotected heights or hazardous machinery, but could have occasional exposure to vibration, wetness, and humidity, and could occasionally drive a motor vehicle. The individual could perform simple, routine, repetitive tasks requiring occasional interaction with the public and coworkers. The VE testified that such an individual could perform the work of document preparer, printed circuit board inspector, and lens inserter. Tr. 679. All three jobs are SVP 2. Tr. 679.

The ALJ asked the VE whether the testimony was consistent with the Dictionary of Occupational Titles. The VE testified that it was, however, he also stated that it was supplemented by his knowledge and experience "as it relates to no overhead reaching." Tr. 680.

### D.    The Decision

The ALJ determined that Porter suffered the following severe impairments: degenerative disc disease, right shoulder arthritis and tendinopathy, bilateral hip osteoarthritis, bilateral knee arthritis, fibromyalgia, chronic obstructive pulmonary disease, sleep apnea, obesity, anxiety, and depression.  The ALJ found that Porter has the residual functional capacity:

> to lift and/or carry 10 pounds occasionally and frequently; sit (with usual breaks) for about 6 hours in an 8 hour workday; and stand and/or walk (with usual breaks) for about 2 hours in an 8-hour workday.  The claimant is able to frequently push and/or pull with the upper extremities.  The claimant is able to occasionally operate foot controls.  The claimant is unable to climb, kneel, crouch or crawl. The claimant is unable to walk on uneven surfaces.  The claimant cannot perform no overhead reaching, but is frequently able to reach in all other directions. The claimant is occasionally able to stoop. The claimant is frequently able to handle and finger.  The claimant should have no exposure to extremes of heat or cold, fumes, odors, dusts, gases, or poorly ventilated area.  The claimant is unable to work around dangers such as unprotected heights and hazardous machinery.  The claimant is occasionally able to tolerate exposure to vibration.  The claimant is occasionally able to operate a motor vehicle.  The claimant is occasionally able o work around wetness and humidity.  The claimant can perform simple, routine and repetitive tasks requiring only occasionally [sic] contact with the public and coworkers.

Tr. 638.  Relying on vocational expert testimony, the ALJ concluded that Porter's impairments would not preclude her from performing work that exists in significant numbers in the national economy.  Tr. 648.

## II.    Discussion

The Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole.  *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015).   Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion.  *Id.*  The Court must consider evidence that both supports and detracts from the Commissioner's decision, but cannot reverse the decision because substantial evidence also

exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If the Court finds that the evidence supports two inconsistent positions and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015).

Porter argues that the Commissioner's decision must be reversed because the ALJ failed to consider and identify the weight given to all of the opinions of record, because the ALJ violated the Court's previous remand Order, because the ALJ's RFC is unsupported by substantial evidence, and because the Commissioner failed to sustain her burden at Step Five.

### A.     Opinion Evidence

Under 20 C.F.R. § 404.1527(c), ALJs are required to consider all medical opinions, and decide how much weight that each should be afforded. Porter argues that the ALJ committed reversible error by failing to consider Dr. Ceaser and Dr. Isenberg's medical opinions, or to identify the weight that was given to them. The Commissioner concedes that the ALJ failed to acknowledge either opinion, and that she was indeed required to. However, the Commissioner maintains that the error was harmless. The Court disagrees.

There is some debate as to whether Dr. Ceaser's opinion contains any restrictions that were not adopted in the ALJ's RFC.[1]  Dr. Isenberg's opinion, however, contains several limitations that the ALJ failed to include. Dr. Isenberg opined that Porter had mild restriction of activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace. Tr. 717. He also opined that Porter

---

[1]     Porter argues that the ALJ omitted Dr. Ceaser's limitations on climbing ladders, ropes, scaffolds, ramps, and stairs, as well as balancing. The ALJ's RFC found that Porter is unable to climb, which presumably applies to everything. However, it is unclear how limitations on balancing relate to the ALJ's RFC.

was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. Tr. 722. Conversely, the only mental limitations found in the ALJ's RFC are that Porter "can perform simple, routine and repetitive tasks requiring only occasionally [sic] contact with the public and coworkers." Tr. 638.

The Commissioner argues that the ALJ's error is harmless because simple, routine, and repetitive work does not require more than occasional interactions with a supervisor. Yet, SSR 85-15 provides that, "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) . . . to respond appropriately to supervision, coworkers, and usual work situations . . . ." *See also* SSR 96-9p ("These mental activities are generally required by competitive, remunerative, unskilled work: . . . responding appropriately to supervision, co-workers and usual work situations."). Moreover, the Social Security Rulings suggest that a "substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." SSR 85-15. Therefore, the Commissioner's *post hoc* rationalization of the ALJ's decision is unsupported by the Social Security Rulings.

The Commissioner also cites two cases in support of her argument, *Hepp v. Astrue*, 511 F.3d 798 (8th Cir. 2008), and *Brueggemann v. Barnhart*, 348 F.3d 689 (8th Cir. 2003). Neither case, however, involved an ALJ's failure to consider and weigh a medical opinion. In *Hepp*, the ALJ found that a claimant could perform his past relevant work in one paragraph, but then stated in another paragraph that the claimant could not. *Hepp*, 511 F.3d at 803. The Eighth Circuit held that the error was harmless because in reading the opinion as a whole, it remained clear that the ALJ found the claimant could perform his past work. *Id.* at 806. In *Brueggemann*, the Eighth Circuit declined to apply the harmless error doctrine where an ALJ failed to follow procedures that outlined how to account for substance abuse disorders. 348 F.3d at 695. There, the Eighth Circuit noted that the ALJ's "abbreviated decision-making" deprived it of a solid

record on which to decide. *Brueggemann*, 348 F.3d at 689. Indeed, this Court faces a similar issue. The ALJ's silence regarding Dr. Isenberg's opinion hinders its ability to find that the error is harmless.

Dr. Isenberg opined that Porter had limitations significantly impacting her ability to perform work on a sustained basis. The ALJ failed to identify the weight afforded to the opinion, and, moreover, there is nothing to suggest that the opinion was even considered. *See e.g.*, *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (finding that "given the ALJ's specific references to findings set forth in [the doctor's] notes," it is "highly unlikely that the ALJ did not consider and reject [them]"). The Court cannot find such an error harmless, because it is uncertain whether the ALJ would have reached the same decision had she considered the opinion. It is possible, because the ALJ was permitted to discount Dr. Isenberg's opinion. However, the error is not that the ALJ discounted Dr. Isenberg's opinion. The error is that it is unclear whether the ALJ did discount the opinion, and why. *See McCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008) ("The problem with the ALJ's opinion is that it is unclear whether the ALJ did discount [the doctor's] opinion, and, if it did so, why.").

Accordingly, the Court orders remand.

**B.    This Court's Previous Remand Order**

Porter argues that the ALJ committed reversible error in violating the Court's previous remand Order. "Deviation from the court's remand order in the subsequent administrative proceeding is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989). The doctrine of the law of the case and the mandate rule "require[s] the administrative agency to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart." *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002) (quoting *Wilder v. Apfel*, 153 F.3d

799, 803 (7th Cir. 1998)).

In the ALJ's first decision, she afforded Dr. Navato's opinion "little weight." Upon review, the Court found that decision not to be supported by substantial evidence. Tr. 754. In the Court's remand order, it directed the ALJ to afford increased weight to Dr. Navato's opinion "based on its degree of consistency with Porter's medical records and his longstanding treatment relationship with her." Tr. 759. The ALJ subsequently afforded Dr. Navato's opinion "little weight" again, and offers no compelling reason for the ALJ's departure.

The Commissioner argues that the ALJ's failure to afford Dr. Navato's opinion increased weight, as she was ordered to, is supported by new evidence that has been added to the record in the time since this case was initially remanded. While it is true that the record has grown by over 2,000 pages, and there are several new opinions, it does not appear from the ALJ's decision that it is the cause for her deviance. In explaining her decision to once again afford Dr. Navato's opinion little weight, the ALJ does not cite to any of the copious new evidence on the record. Furthermore, the ALJ's second decision fails to address the Court's remand order at all, let alone explain why she chose not to obey it. Indeed, the ALJ does not even attempt to distinguish her second decision to afford Dr. Navato's opinion little weight from her first.

This case has already been remanded on one occasion, in part because the ALJ erred in her treatment of Dr. Navato's opinion. The ALJ's failure to obey the Court's previous remand order, or even attempt to offer a compelling reason for deviating, constitutes legal error, which requires a second remand.

## C.    Support for the RFC

Residual functional capacity refers to what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004). An ALJ must formulate the RFC based on all of the relevant, credible evidence in the

record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of his limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

Porter maintains that the ALJ's RFC is not supported by substantial evidence because she failed to explain why certain limitations were not adopted from various opinions, despite affording the opinions some weight, and because the ALJ improperly weighed an opinion.

### i. Dr. Danushkodi

Porter argues that the ALJ erred in failing to explain why she did not include Dr. Danushkodi's limitations on stooping, rest, and balancing, despite affording the opinion "some weight." Under SSR 96-8p, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." However, an ALJ is not required to rely entirely on a particular physician's opinion . . . ." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). Rather, "[i]t is the function of the ALJ to weigh conflicting evidence and to resolve disagreements among physicians." *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (quoting *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007)); *see also Peterson v. Colvin*, No. 13-0329-CV-W-ODS, 2013 WL 6237868, at *4 (W.D. Mo. Dec. 3, 2013) ("Plaintiff overstates the law by contending there must be medical evidence that precisely supports each component of the RFC."). Here, the ALJ explained her reasoning in rejecting Dr. Danushkodi's

stooping limitation, as was required, and she incorporated limitations on rest and balancing into the RFC.

The ALJ explained that she rejected Dr. Danushkodi's limitation on stooping because such a restriction "tends to be incongruous with clinical evidence for full and/or near full strength to the lower extremities," and "with the claimant's daily activities which include the ability to do some household chores and care for children." Tr. 645. Porter maintains that the explanation is erroneous because stooping does not involve lower extremities, but rather "bending the body downward and forward by bending the spine at the waist." Program Operations Manual System ("POMS") DI 25001.001(79). She also argues that the children are gone during the day and cared for by others, and that her chores, such as dishes and folding laundry, do not generally require stooping.

That the use of lower extremities is not contained in the definition of stooping does not mean it is unreasonable for the ALJ to consider. Additionally, there is evidence in the record of Porter's daily activities, including some household chores and care for children. Tr. 875-82. "It is not the role of the court to reweigh the evidence presented to the ALJ." *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 20017)). Additionally, the ALJ addressed Porter's spinal disorders and lower back pain elsewhere in the order, and identified substantial evidence to support her decision that Porter is capable of occasionally stooping. The ALJ noted Porter "routinely has been shown by examinations conducted to be with a full and/or normal musculoskeletal range of motion." Tr. 639 (citing Tr. 977, 1040, 1074, 1166, 1326). The ALJ also specifically acknowledged Dr. Danushkodi's December 2015 exam that showed "positive results to straight leg raise testing," Tr. 640, but observed that a similar such finding is not longitudinally documented, and to the contrary,

routine examinations have consistently found negative results. Tr. 640 (citing Tr. 396, 1166, 1651, 1654, 1657, 1833, and 1837).

Porter next argues that the ALJ's RFC with regard to rest breaks is erroneous. Dr. Danushkodi opined that Porter would require "periodic" rest breaks when standing and walking for a total of four hours. Tr. 1337. The ALJ's RFC limits Porter to "stand and/or walk (with usual breaks) for about 2 hours in an 8-hour workday." Tr. 638. Porter maintains that the ALJ did not account for rest breaks in the RFC because "periodic" breaks and "usual" breaks are different. She contends that "usual" breaks refers to fifteen minutes in the morning, a lunch break, and fifteen minutes in the afternoon, and that if Dr. Danushkodi intended to indicate "usual" breaks, he would have said so. However, Porter does not cite any case, law, regulation, or ruling to support such a contention.

The ALJ was not required to adopt Dr. Danushkodi's opinion verbatim. *See Martise* 641 F.3d at 927. Moreover, the Court is unconvinced that "usual breaks" when standing or walking for two hours is materially different than "periodic" rest breaks when standing and walking for four hours. Even if there is a material difference, Porter does not offer any explanation as to how the ALJ's final decision would differ, and therefore any potential error is harmless. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, [the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred."); *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) ("An arguable deficiency in opinion writing that had no practical effect on the decision . . . is not a sufficient reason to set aside the ALJ's decision.").

Finally, Porter maintains that the ALJ erred by failing to explain why she did not adopt Dr. Danushkodi's opinion that Porter should never balance. Tr. 1331. As above, the ALJ need not adopt the entirety of Dr. Danushkodi's opinion. Additionally, the ALJ's decision with regard

to balance is supported by substantial evidence in the record. The ALJ "noted that examinations conducted both previous and subsequent to [Porter's] knee surgeries have routinely demonstrated full and/or near full strength to the claimant's lower extremities." Tr. 641. The ALJ also acknowledged that while on some occasions Porter was shown to be with antalgic gait, on numerous other occasions Porter was shown to be with normal gait. Tr. 641 (citing Tr. 964, 1074, 1337). The ALJ's RFC with regard to balance is therefore supported by substantial evidence in the record.

### ii. Mr. Keough

Porter similarly argues that the ALJ erred when she gave Mr. Keough's opinion "some weight," but then failed to include all of the limitations imposed by Mr. Keough in the RFC.

While an ALJ is not required to base her RFC entirely on the opinion of one medical source, the ALJ must explain why a medical opinion was not adopted if it conflicts with the RFC. SSR 96-8p ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). Having afforded Mr. Kough "some weight," the ALJ offers no explanation as to why only certain limitations are incorporated in the RFC. Mr. Keough opined that Porter's ability to adapt to the environment of others, respond appropriately to supervision, adjust to changes in a routine, and interact socially in an appropriate manner, appeared mildly to moderately impaired. Tr. 1317. Mr. Keough also opined that Porter had moderate limitations in interacting appropriately with supervisors and responding appropriately to usual work situations and to changes in work settings. Tr. 1322. Yet, as previously discussed, the only mental limitations found in the ALJ's RFC are that Porter "can perform simple, routine and repetitive tasks requiring only occasionally [sic] contact with the public and coworkers." Tr. 638.

Just as with Dr. Isenberg's opinion, discussed *supra* II.A., the ALJ's decision not to

incorporate a restriction on Porter's ability to interact with supervisors had a potentially significant impact on this case's outcome. *See* SSR 85-15 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) . . . to respond appropriately to supervision, coworkers, and usual work situations . . . ."). Additionally, the ALJ also decided not to incorporate Mr. Keough's opinion regarding Porter's ability to respond appropriately to usual work situations and to changes in work settings. This decision also has a potentially significant impact on the outcome. Dealing with changes in a routine work setting is "generally required by competitive, remunerative, unskilled work." SSR 96-9p.

While the ALJ could have relied on other evidence, she failed to explain why parts of the RFC are inconsistent with Mr. Keough's opinion, which she gave "some weight." This is reversible error. *See e.g.*, *Crews-Cline v. Colvin*, No. 4:13-CV-00723-NKL, 2014 WL 2828894 (W.D. Mo. June 23, 2014) (finding that when an ALJ states the RFC is based on one doctor's opinion, which was given "great weight," but then fails to explain why parts of the RFC are inconsistent with that opinion constitutes reversible error). On remand, the ALJ should either formulate an RFC consistent with Mr. Keough's entire opinion, or explain why certain parts of the RFC are inconsistent, and how it is otherwise supported by substantial evidence in the record.

### iii. Dr. Koprivica

Porter argues that the ALJ erred in affording Dr. Koprivica's opinion little weight. She maintains that the ALJ was incorrect in her conclusion that the opinion is inconsistent with the longitudinal record. Dr. Koprivica, a consultative examiner, provided a statement in April 2013. The ALJ afforded Dr. Koprivica's opinions little weight, however, because the record demonstrated a full range to Porter's right shoulder and full to near full strength of her right upper extremity.

The ALJ is entitled to give lesser weight to an opinion if it is inconsistent with the objective evidence. *See Goff v. Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005) ("An appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion."). The ALJ noted that while Dr. Koprivica examined a painful and decreased range to Porter's right shoulder, multiple records after his examination routinely demonstrated a full range to Porter's shoulder. Tr. 640. Porter argues that Dr. Koprivica's opinion is not inconsistent because four other medical examinations also found limited range of motion and shoulder pain. However, only two of the exams that Porter cites occurred after Dr. Koprivica's statement. The ALJ cited seven separate medical examinations that showed normal musculoskeletal range of motion, and twenty-six separate medical examinations that showed near normal to normal strength of the upper extremities. Tr. 640-42. Furthermore, Dr. Lingenfelter, who treated Porter for her shoulder injury, released her to return to full duty. Tr. 2310. Thus, the ALJ's decision to afford Dr. Koprivica's statement little weight due to inconsistencies with the longitudinal record is supported by substantial evidence.

### D. Step Five

Finally, Porter argues reversal is necessary because the Commissioner did not sustain her burden at Step Five. Specifically, Porter argues that the VE precluded overhead reaching, and yet all three jobs that the vocational expert identified require frequent reaching. She also argues that the vocational expert's testimony about two of the three jobs identified—document preparer and printed circuit board inspector—are inconsistent with the Dictionary of Occupational Titles (DOT).

The vocational expert, Dr. Veltrano, testified that a hypothetical individual with Porter's RFC could perform the jobs of document preparer, printed circuit board inspector, and lens inserter. Tr. 679. He also testified that there were 56,000 document preparer jobs in the national

economy, 66,500 printed circuit board inspector jobs in the national economy, and 45,000 lens inserter jobs in the national economy.  Tr. 679.

###### i.  Overhead Reaching

Porter argues that the RFC's preclusion on overhead reaching conflicts with all three jobs that the vocational expert identified, because each requires frequent reaching.  *See* Dictionary of Occupational Titles ("DOT") 249.587-018, 1991 WL 672349 (4th Ed. Rev. 1991) (Document Preparer); DOT 713.687-026, 1991 WL 679273 (Lens Inserter); DOT 726.684-110, 1991 WL 679616 (Printed Circuit Board Inspector).  The Social Security Administration's Program Operations Manual System's Medical and Vocational Quick Reference Guide (the "Program Operations Manual") defines "[r]eaching" as "[e]xtending the hands and arms in any direction." DI 25001.001(A)(63) (available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001). Porter argues that the definition therefore includes overhead reaching.

The ALJ specifically asked Dr. Veltrano, however, whether his testimony was consistent with the DOT.  Dr. Veltrano testified that it was, but that it was also supplemented by his knowledge and experience of human resources and work practices in business and industry, "as it relates to no overhead reaching."  Tr. 680.  Thus, the vocational expert expressly addressed and resolved the apparent conflict between the DOT description, the Program Operations Manual, and Porter's RFC.

This case is distinguishable from the cases that Porter cites in which the vocational expert did not address apparent inconsistencies between the DOT definition and a claimant's limitations.  *See Moore v. Colvin*, 769 F.3d 987, 989-90 (8th Cir. 2014) (holding that a vocational expert "must offer an explanation for any inconsistencies between her testimony and the DOT, which the ALJ may accept as reasonable after evaluation," where vocational expert, when asked if her testimony was consistent with the DOT, stated merely, "Yes, it is"); *Kemp ex*

*rel. Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014) (noting, in vacating decision affirming denial of benefits, that "the record does not reflect whether the VE or the ALJ even recognized the possible conflict between the hypothetical describing a claimant who could reach overhead only occasionally," and the job as described in the DOT); *Gribble v. Colvin*, No. 14-0027, 2015 WL 847479, at *22 (E.D. Mo. Feb. 26, 2015) (same) (quoting Kemp, 743 F.3d at 633); *O'Leary v. Colvin*, No. 13-CV-00230-DW, Doc. 15, at 4 (W.D. Mo. Feb. 7, 2014) ("[T]here appears to be a conflict between the VE's testimony and the DOT.  Remand is required because the ALJ did not address and then resolve this conflict in her Decision."); *Coates v. Colvin*, No. 14-0843-ODS, 2015 WL 4610991, at *2 (W.D. Mo. July 30, 2015) (finding that ALJ had erred in failing to "obtain an explanation for" a conflict between the vocational expert's testimony and the DOT).

Substantial evidence in the record supports the ALJ's conclusion that Porter's inability to reach overhead does not preclude her from performing the duties of document preparer, lens inserter, or printed circuit board inspector.

### ii.    Document Preparer and Lens Inserter

Porter further argues that the vocational expert's testimony about two of the three jobs identified—document preparer and lens inserter—was inconsistent with the DOT.  Specifically, she argues that her RFC is limited to "simple, repetitive, routine" work, but the document preparer job is not described as repetitive, DOT 249.587-018, 1991 WL 672349, and that her RFC precludes her from the use of any hazardous machinery or exposure to extreme heat, fumes, odors, dusts, and gases, but printed circuit board inspector involves "cleaning boards with Freon" and using a "soldering iron."  DOT 726.684-110, 1991 WL 679616.  Porter's argument does not merit reversal.

Assuming that the document preparer and printed circuit board inspector jobs are

inconsistent with the DOT, as Porter argues, the VE identified at least one other job that is not: lens inserter. Porter suggests that because the VE's testimony is not consistent with the DOT and the ALJ did not resolve the conflict, the ALJ may not rely on any of the VE's testimony. However, the Eighth Circuit has expressly held that a VE's "mistaken recommendation" can be harmless error where the VE has recommended other work that a claimant can perform with her RFC. *See Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014). Nothing suggests that Dr. Veltrano failed to identify another job consistent with the DOT. Indeed, Porter acknowledges that lens inserter is specifically identified to be repetitive, and makes no argument that it otherwise conflicts with her RFC.[2] DOT 713.687-026, 1991 WL 679273 (Lens Inserter).

Porter's arguments concerning the Step Five findings therefore fail.

**III.    Conclusion**

For the reasons discussed above, the Court REMANDS this case to the Commissioner for further proceedings consistent with this opinion.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  March 7, 2018
Jefferson City, Missouri

---

[2]    Aside from the overhead reaching argument, discussed above.